**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |
|---|---|
| JAVIER P. | : |
|  | : |
| v. | : NO. 25-CV-5028 |
|  | : |
| FRANK BISIGNANO, | : |
| Commissioner for Social Security | : |
|  | : |

**O P I N I O N**

SCOTT W. REID                                             DATE:  March 9, 2026
UNITED STATES MAGISTRATE JUDGE

Javier P. brought this action under 42 U.S.C. §405(g) to obtain review of the decision of the Commissioner of Social Security denying his claim for Supplemental Security Income ("SSI").  He has filed a Request for Review to which the Commissioner has responded.  As explained below, I conclude that the Request for Review should be denied and judgment granted in favor of the Agency.

I.      *Factual and Procedural Background*

Javier P. was born on May 24, 1973.  Record at 437.  He left school after the tenth grade. Record at 502.  Javier P. worked in the past as a construction worker and a loader of waste management trucks.  Record at 502.  On June 3, 2020, he filed an application for SSI, alleging disability as of May 28, 2020, on the basis of bipolar disorder, fibromyalgia, and insomnia. Record at 437, 501.

Javier P.'s application was denied initially on March 29, 2021.  Record at 215.  It was denied again upon reconsideration on November 15, 2022.  Record at 234.  Javier P. then sought review *de novo* by an Administrative Law Judge ("ALJ").  Record at 244.

Two hearings were held in this matter before a single ALJ, on August 2, 2022, and November 15, 2022. Record at 20, 48. For reasons which are not clear, the ALJ never issued a decision. A new hearing was held before a different ALJ on June 30, 2024. Record at 107. On July 20, 2024, however, the ALJ issued a written decision denying benefits. Record at 23. The Appeals Council denied review, permitting the ALJ's decision to stand as the decision of the Commissioner for Social Security. Record at 1. Javier P. then filed this action.

II.    *Legal Standards*

The role of this court on judicial review is to determine whether the Commissioner's decision is supported by substantial evidence. 42 U.S.C. §405(g); *Richardson v. Perales*, 402 U.S. 389 (1971); *Newhouse v. Heckler*, 753 F.2d 283, 285 (3d Cir. 1985). Substantial evidence is relevant evidence which a reasonable mind might deem adequate to support a decision. *Richardson v. Perales*, *supra*, at 401. A reviewing court must also ensure that the ALJ applied the proper legal standards. *Coria v. Heckler*, 750 F.2d 245 (3d Cir. 1984).

To prove disability, a claimant must demonstrate that there is some "medically determinable basis for an impairment that prevents him from engaging in any 'substantial gainful activity' for a statutory twelve-month period." 42 U.S.C. §423(d)(1). Each case is evaluated by the Commissioner according to a five-step process:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled. (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement in §404.1590, or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled. (iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled.

20 C.F.R. §404.1520(4) (references to other regulations omitted).

2

Before going from the third to the fourth step, the Commissioner will assess a claimant's residual functional capacity ("RFC") based on all the relevant medical and other evidence in the case record.  *Id*.  The RFC assessment reflects the most an individual can still do, despite any limitations.  SSR 96-8p.

The final two steps of the sequential evaluation then follow:

> (iv)  At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work.  If you can still do your past relevant work, we will find that you are not disabled.  (v)  At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work.  If you can make the adjustment to other work, we will find that you are not disabled.  If you cannot make an adjustment to other work, we will find that you are disabled.

*Id*.

III.     *The ALJ's Decision and the Claimant's Request for Review*

In his Decision, the ALJ found that Javier P. suffered from the severe impairments of bipolar disorder, posttraumatic stress disorder, generalized anxiety disorder, fibromyalgia, and lumbar degeneration.  Record at 25.  He also recognized that Javier P. suffered from obesity, and diabetic neuropathy in the feet, but found these impairments to be non-severe.  Record at 26.  He concluded that none of these impairments, and no combination of impairments, met or medically equaled a listed impairment.  Record at 27-30.

The ALJ decided that Javier P. retained the RFC to engage in a range of light work:

> [H]e can lift and carry, push and pull 20 pounds occasionally and 10 pounds frequently; can stand and walk for 6 hours of an 8 hour work day with standard breaks; can sit for 6 hours of an 8 hour work day with standard breaks; can frequently stoop, climb ramps and stairs, kneel crawl, crouch, and balance … and can occasionally climb ladders, ropes, and scaffolds.  He can understand, remember, and carry out simple tasks; can make simple work-related decisions; can have occasional work-related interactions with co-workers, supervisors, and the general public; and can have occasional changes in the work setting.

Record at 30.

3

Relying upon the testimony of a vocational expert who appeared at the hearing, the ALJ concluded that Javier P. could not return to his former work, but could work in such jobs as routing clerk, marking clerk, and collator operator.  Record at 39.  He decided, therefore, that Javier P. was not disabled.  Record at 40.

In his Request for Review, Javier P. argues that the ALJ erred in the following respects:

(1) failing to include in the RFC assessment a limitation to one to two-step tasks, despite the fact that "every medical opinion contained such a limitation;"

(2) failing to either incorporate limitations relating to his obesity and diabetic neuropathy into the RFC assessment, or explain why he declined to include them;

(3) finding him capable of light work despite his fibromyalgia pain;

(4) improperly evaluating his subjective testimony as to his symptoms.

*Brief and Statement of Issues in Support of Request for Review* at 11-24.

IV.    *Discussion*

A.    *One and Two-Step Tasks*

Agency reviewing mental health expert John David Gavazzi, Psy.D., wrote:  "The claimant can make simple decisions.  The claimant would be able to maintain regular attendance and be punctual.  The claimant is able to carry out very short and simple instructions.  *The claimant can perform one- and two-step tasks*."  Record at 180 (emphasis supplied).  Upon reconsideration, Thomas E. Fink, Ph.D., another agency reviewing mental health expert, made the same finding.  Record at 207.  Nevertheless, Kathleen Ledermann, Psy.D., a consulting independent mental health expert who (unlike Drs. Gavazzi and Fink) met with Javier P., indicated that he had only mild limitations in the ability to understand, remember, and carry out simple instructions, and to make judgments on simple work-related decisions.  Record at 865.

4

Thus, Javier P.'s argument to the contrary, not "every" medical opinion limited Javier P. to one and two-step tasks.  Rather, there was conflicting evidence.  The ALJ did not ignore this issue.  He found the reports from the agency medical mental health experts "generally persuasive," but he added:  "On the other hand, the opinions that the claimant is limited to performing one and two-step tasks is [*sic* "are"] not persuasive and is neither supported by the evidence reviewed by these consultants, nor is it consistent with later treatment evidence or with the exam findings and opinions of Dr. Ledermann."  Record at 36.

According to Javier P., the ALJ erred in failing to specify the evidence with which the findings of the agency experts were inconsistent.  In fact, however, the ALJ initially noted that they were inconsistent with Dr. Ledermann's January 13, 2021, opinion.  Record at 36.  As above, Dr. Ledermann found Javier P. to be only mildly limited in his ability to carry out "simple" instructions, despite finding him impaired in attention, concentration, and memory.  Record at 862.  Dr. Ledermann also observed that Javier P. was able to "dress, bathe, and groom himself, cook and prepare food, do general cleaning, laundry, shop, and manage money."  Record at 863. These activities clearly involve more than one or two steps.

Further, the ALJ noted in an earlier part of his decision that, in his Function Report, Javier P. indicated that he could "manage money, including paying bills, counting change, handling a savings account, and using a checkbook/money orders."  Record at 29, 550.  He could also "shop in stores."  Record at 29, 550.

Also, treating mental health experts, who would have the best opportunity to observe Javier P., routinely found him to have normal immediate and remote memory, and frequently found him to have normal cognition.  Record at 809, 811, 1001, 1006 (cognition only average,

but memory "good"); 1009, 1012, 1255 and 1280.  The ALJ discussed this in his decision.
Record at 29.

All of the above was either "evidence reviewed by" the agency consultants, or "later treatment evidence" as mentioned by the ALJ.  Record at 36.  Thus, the ALJ's decision to reject the limitation to one and two-step tasks was both supported by substantial evidence and adequately explained by the ALJ in his decision.  There is no basis for relief here.

B.    *Obesity and Neuropathy*

According to Javier P., the ALJ did not sufficiently discuss or consider the effect of his non-severe obesity and diabetic neuropathy on his RFC.  However, review of the ALJ's decision and the medical record shows that the ALJ's opinions about these impairments were adequately discussed and supported by substantial evidence.

As to Javier P.'s obesity, the ALJ wrote:

The claimant's obesity is non-severe.  He has been documented with body mass index (BMI) scores over 30 throughout the entire period at issue.  He has used some medications for weight loss, and has been advised on dietary changes/improving nutrition for this condition.  However, there is no evidence in the file that this condition more than minimally impacts the claimant's ability to perform basic work activities.  Despite his elevated BMI scores, the evidence does not document related abnormalities such as deformity, clubbing, cyanosis, chronic edema, heat, discoloration, ulceration, diminished pulsation, or atrophic changes.  Accordingly, I conclude that this impairment is non-severe.  However, I have evaluated the combined effects of obesity with other impairments, as this may be greater than might be expected without obesity, and have incorporated any such combined effect into the residual functional capacity below, pursuant to SSR 19-2p.

Record at 26.  (Internal citations omitted).

Elsewhere in his decision, the ALJ noted that consultative examiner Karen Hammon, N.P., observed in a January 23, 2021, report that Javier P. had a short-strided but steady gait and a normal stance.  Record at 32, *citing* 878.  He could walk on his heels and toes without difficulty, and did not use an assistive device.  *Id*.  On November 3, 2021, another consulting

examiner, Ziba Monfared, M.D., also found that Javier P. did not use an assistive device and had a normal stance and gait. Record at 32 *citing* 1031. Again, he could heel and toe walk. *Id*. Both Dr. Monfared and Nurse Practitioner Hammon found that Javier P. had full 5/5 strength in all extremities, his joints appeared normal and (as discussed further below), he had 0/18 of the trigger points characteristic of fibromyalgia. Record at 879, 1032.

Nurse Practitioner Hammon found that Javier P. could stand for only two hours in an eight-hour workday. Record at 881. The ALJ found this inconsistent with her physical examination. Record at 36. Dr. Monfared, however, found that Javier P. could stand and walk for seven hours each in an eight-hour workday. Record at 1035. The ALJ found the part of Dr. Monfared's report regarding postural and exertional limitations to be "generally supported by the evidence that this consultant had available for review." Record at 36. However, he rejected Dr. Monfared's finding that Javier P. could work at a heavy exertional level. Record at 36, 1035. Despite his obesity, therefore, Javier P. had a largely normal physical examination.

Further, the agency medical expert who reviewed the medical records upon reconsideration indicated in an opinion dated November 15, 2021, that Javier P. could engage in light work with no postural limitations. Record at 203. However, the ALJ disagreed with this, and found Javier P. had some postural limitations. Record at 37.

Thus, the ALJ's discussion of Javier P.'s obesity was adequately explained and supported by medical examination and opinion evidence. The ALJ reviewed the medical examination results and opinions in detail, and he explained which parts he accepted, and which parts he did not, and why not. This is consistent with the ALJ's duty to consider obesity, as described in SSR 19-2p, and with his responsibility to render an RFC assessment based on all of the relevant medical and other evidence. 20 C.F.R. §416.945(a)(3).

7

Similarly, the ALJ recognized that Javier P. had been diagnosed with diabetic neuropathy among other foot impairments:

> He has occasionally been noted with diminished sensation in the bilateral feet on monofilament testing and vibratory testing, as well as some foot tenderness on examinations; however, he has not required treatment for these conditions beyond some podiatry visits, recommendations for use of orthotics/diabetic shoes, and home exercises for plantar fasciitis. The evidence of record has typically noted intact gait and/or with no use of an assistive device for ambulation. As this evidence does not show that these conditions more than minimally impact the claimant's ability to perform basic work activities, they are found to be non-severe.

Record at 26.

Javier P. argues that no intensive treatment for diabetic neuropathy exists beyond the use of orthotics and diabetic shoes, rendering the ALJ's analysis irrelevant. The Commissioner does not dispute this point, and it appears to be accurate. Https://mayoclinic.org/diseases-conditions/diabetic-neuropathy/diagnosis-treatment/drc-20371587 (last visited February 17, 2026). Thus, the ALJ erred in suggesting that Javier P.'s treatment did not support his claim.

Nevertheless, the ALJ cited evidence suggesting that Javier P. had no significant impairment arising from the neuropathy in his feet, given the findings of a normal gait, ability to heel and toe-walk, and the absence of the need for a cane or other assistive device. Moreover, Javier P.'s reference to his "diminished" monofilament testing as determining "whether a person has neuropathy so severe as to cause an ulcer or gangrene" is somewhat misleading. Request for Review at 15, n. 10. A monofilament test simply involves a "soft nylon fiber" brushed over "areas of [the patient's skin]" to "check how sensitive [the patient is] to touch." Https://mayoclinic.org/diseases-conditions/diabetic-neuropathy/diagnosis-treatment/drc-20371587 (last visited February 17, 2026).

As above, the ALJ recognized that Javier P. had diminished sensation in his feet.  It is more significant that Javier P. has never been diagnosed with a foot ulcer, or gangrene.  In any event, the microfilament test revealed only "slightly" diminished sensation.  Record at 1165.

Accordingly, the ALJ's error as to the significance of Javier P.'s course of treatment does not undermine the substantial evidence upon which he relied in assessing the effect of Javier P.'s neuropathy upon his RFC.  Remand is not necessary because it would not change the outcome of the case.  *Rutherford v. Barnhart*, 399 F.3d 546 (3d Cir. 2005).

C.    *Fibromyalgia and Lumbar Degeneration*

The ALJ found Javier P. to suffer from fibromyalgia and lumbar degeneration as severe impairments.  Record at 25.  He discussed their resulting functional limitations together:

> The claimant's chronic pain from his fibromyalgia and his lumbar degeneration are documented in the evidence of record, and this pain has been effectively managed with treatment including pain management specialist involvement, medications, trigger point injections, lumbar medial branch block injections, and radiofrequency ablations.  A remote MRI study of the lumbar spine from 2012 noted only a mild disc bulge at L5-S1, and updated lumbar x-rays taken in November 2020 document mild lower lumbar facet degenerative joint disease.  He has been documented with some examination abnormalities related to these impairments at times, such as lumbar tenderness to palpation, lumbar pain with range of motion, abnormal gait, reduced lumbar range of motion, facet line tenderness, reduced ability to squat, and positive facet loading test; however, he has also been noted in no acute distress, with intact toe and heel walk bilaterally, intact/stable gait, no trigger points, full/intact strength, and normal/intact deep tendon reflexes.

Record at 31.  (Internal citations omitted).

Javier P. also discusses the two impairments together in his third claim, which is that the ALJ's analysis was defective and led to an erroneous conclusion that he could engage in light work.  Request for Review at 20-24.  Although he primarily discusses the ALJ's treatment of his fibromyalgia, he also criticizes the ALJ's analysis of evidence which is more relevant to degenerative disc disease.

1.    *Lumbar Degeneration*

As the ALJ noted, objective tests have never shown significant abnormalities in Javier P.'s lumbar spine.  The 2012 MRI was almost normal, with only a mild disc bulge at L5-S1, and all lumbar discs normal in stature and signal intensity.  Record at 1054.  There was no disc herniation or stenosis at any level.  *Id*.  Eight years later, an X-ray taken on November 30, 2020, still showed only "mild lower lumbar facet" degenerative joint disease, and was otherwise normal, with preserved disc spaces and normal vertebral heights.  Record at 1109.

Thus, the record does not show a medical basis for significant pain from lumbar degeneration.  This, together with the examination findings of normal muscular strength and gait, supports the RFC assessed by the ALJ, despite the existence of some evidence of lumbar symptoms.  As to lumbar degeneration, therefore, the ALJ's analysis of the evidence was neither erroneous nor unexplained.

2.    *Fibromyalgia*

Fibromyalgia is a more complicated issue.  It is a syndrome characterized primarily by widespread pain in the joints, muscles, tendons, or nearby soft tissues.  SSR 12-2p.  "In stark contrast to the unremitting pain of which [fibromyalgia] patients complain, physical examinations will usually yield normal results – a full range of motion, no joint swelling, as well as normal muscle strength and neurological reactions."  *Higgins v. Saul*, Civ. A. No. 19-2934, 2020 WL 2539210 at **3-4 (E.D. Pa. May 19, 2020), *citing Foley v. Barnhart*, 432 F. Supp. 2d 465, 480 (M.D. Pa. 2005).  Thus, Javier P. is correct in suggesting that much of the evidence cited by the ALJ about normal examination results and x-ray findings is irrelevant to fibromyalgia.

The exception to this is the observation made by both Nurse Practitioner Hammon and Dr. Monfared that Javier P. had no painful trigger points.  Record at 879, 1032.  Trigger points are characteristic of fibromyalgia, and identifying them has been called "the only somewhat objective diagnostic technique" for the condition.  *Foley*, *supra*, at 477, *and see Roldan v. Kijakazi*, Civ. A. No. 21-621, 2023 WL 2567988 at *12 and n. 20 (M.D. Pa. Feb. 28, 2023).  The absence of trigger points here cannot be read to mean that Javier P. did not have fibromyalgia; the ALJ accepted the diagnosis of fibromyalgia and found it to be a severe impairment. However, it could support a conclusion that Javier P.'s fibromyalgia was under control at the times he was examined.

And, of course, a diagnosis of fibromyalgia is not equivalent to a finding of disability. "As with any claim for disability benefits, before we find that a person with an MDI of [fibromyalgia] is disabled, we must ensure there is sufficient objective evidence to support a finding that the person's impairment(s) so limits the person's functional abilities that it precludes him or her from performing any substantial gainful activity."  SSR 12-2p.  This is accomplished by considering "all the evidence in the case record, including the person's daily activities, medications or other treatments the person uses, or has used, to alleviate symptoms; the nature and frequency of the person's attempts to obtain medical treatment for the symptoms; and statements by other people about the person's symptoms."  *Id*.

In this case, some treatment notes from Javier P.'s primary care practice describe his fibromyalgia as well-controlled.  Record at 704 (November 11, 2019:  "Pt states that his fibromyalgia is well controlled"); 825 (May 15, 2020:  "He feels fibro controlled").

11

More recent notes report fibromyalgia pain but also a show a failure to participate in recommended treatment.  The ALJ discussed this:

> The claimant presented for [a] pain management physical therapy fibromyalgia evaluation on May 13, 2022, and he was found with "decreased strength/ROM/flexibility/endurance, altered posture/balance/breathing/ tenderness to palpation" … Recommendations included physical therapy once a week for 12 to 14 sessions, however, it does not appear he returned for this fibromyalgia-specific treatment, as his return visit in July 2022 found the claimant asked to focus on his right knee complaints.  He was also evaluated by pain management occupational therapy related to his fibromyalgia on May 13, 2022, with a recommendation for 6 to 8 visits of occupational therapy treatment for upper extremity range of motion and strengthening, cognitive retraining, mind/body connection (stress management education), sleep hygiene education, pain education, and ADL retraining/pacing education.  There is no evidence to support that he returned for these recommended occupational therapy sessions.

Record at 32, *citing* 1362, 1363-7.  (Internal citations omitted).

Javier P. argues that the ALJ should have considered whether his failure to attend the fibromyalgia treatment was caused by transportation issues.  Indeed, after three sessions of physical therapy, Javier P. was discharged on July 28, 2022:

> Pt has been having transportation difficulty and is unable to get to PT appointments.  Called pt to discuss if/when he will be able to start PT and pt notes that he needs to wait on getting his application and then having it sign[ed] by the physician.  He is not sure of the timeline for this.  Discussed with pt that since there is no specific date that he can start PT will discharge him at this time.  Pt verbalized understanding and agrees to plan.

Record at 1378.  Thus, it is not clear whether the obstacle to treatment was transportation, or Javier P.'s failure to obtain a signed "application" (possibly for free transportation?).  It is worth noting that Javier P. has submitted 709 pages of treatment notes to the record, suggesting that he was usually able to attend medical appointments.

The ALJ also discussed the medications and trigger point injections prescribed to manage Javier P.'s fibromyalgia.  Record at 31, *citing* Record at Exhibits 14-17F, 21F, 22F, 29F and F30.  Elsewhere in his decision, the ALJ discussed Javier P.'s representations as to his daily activities, i.e., that he lived alone, and "manage[d] his own activities of daily living including laundry,

12

preparing meals, and cleaning." Record at 34, *citing* 513, 515, 547, 549-550,1031. (As noted above, Javier P. also told Dr. Ledermann that his daily activities included general cleaning, laundry, and grocery shopping. Record at 863).

Thus, the ALJ considered Javier P.'s daily activities, medications, other treatments, and the nature and frequency of his attempts to obtain medical treatment, just as directed by SSR 12-2p, which is specific to fibromyalgia. More generally, he considered Javier P.'s "medication, treatment, and daily activities" in assessing the level of pain he experienced, as directed by SSR 16-3p ("Evaluation of Symptoms in Disability Cases"). 2017 WL 5180304 (Oct. 25, 2017).

Based on the foregoing, I am not able to agree with Javier P. that the ALJ's assessment of his fibromyalgia was erroneous or insufficiently explained. Because the ALJ's analysis was supported by substantial evidence, there is no basis upon which this Court can disturb it, even if it could be said that the record supports another rational interpretation of the evidence. *See Sanchez v. Barnhart*, 186 Fed. App'x. 187, 191 (3d Cir. 2006); *Brewington v. Commissioner of Soc. Sec.*, Civ. A. No. 21-5482, 2024 WL 329529 at *8 (E.D. Pa. Jan. 29, 2024).

D.     *The Subjective Testimony*

Finally, Javier P. argues that the ALJ erred in evaluating his subjective symptoms, primarily his description of his pain. Javier P. testified at his June 30, 2024, hearing that he could walk only fifteen minutes, sit for fifteen to twenty minutes, and stand for fifteen minutes at a time. Record at 119, 131. He testified that he was "constantly moving from one position to another position" to alleviate his pain. Record at 119. However, the ALJ concluded: "the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." Record at 31, 119, 131.

The ALJ supported this conclusion with the paragraphs reproduced above regarding

Javier P.'s treatment for lumbar back pain and fibromyalgia, and with a discussion of his

physical examination results.  Record at 31-2.  He then wrote:

> In summary, with respect to the claimant's physical impairments, the medical evidence of record documents the claimant's reports of pain and limitation to his treatment providers, but the evidence documents that his functional limitations are not as restricted by his medical impairments as alleged and the treatment he has undertaken has been generally conservative and partially effective to the extent he has followed through.

Record at 32.

> Later in his decision, the ALJ added:

> Based on the evidence summarized in detail above, the claimant's statements concerning the intensity, persistence, and limiting effects of his symptoms are not entirely consistent with the medical evidence and other evidence in the record.  The claimant has been documented with some physical examination abnormalities at times in the record, as detailed above; however, he has also been noted in no acute distress, with intact toe and heel walk bilaterally, intact/stable gait, no trigger points, full/intact strength, and normal/intact deep tendon reflexes.  Imaging of his spine has shown mild abnormalities, and he has not undergone updated imaging of the spine since 2020, which suggests he has not demonstrated concerning examination findings that might have prompted such additional imaging.  The evidence does not document that he has sought emergency department services for complaints of uncontrolled pain, nor does the record show involvement of a rheumatology specialist for his fibromyalgia. He has not undergone injections for his spinal complaints since 2021.

Record at 33, *citing* 877-8, 904-13, 986, 1031-33, 1044, 1139.

Also, the ALJ noted that some of Javier P.'s own representations were inconsistent with

his statements at the hearing:

> I note that the claimant's statements at times suggest a higher level of functioning than alleged.  During a phone call to discuss his treatment for lower back pain in November 2020, he reported that he was not using an assistive device, did not require assistance with activities of daily living (ADLs), and that his pain did not interfere with his normal sleep pattern.  In November 2021, he reported he was living alone, and did his own cooking, cleaning, laundry, and shopping.  Function reports completed by the claimant note that he has lived alone during the entire period at issue, and that he shops in stores, manages his own finances, and manages his own activities of daily living including laundry, preparing meals, and cleaning.  For these reasons, the claimant's statements

14

concerning the intensity, persistence, and limiting effects of his symptoms are not entirely consistent[1] with the medical evidence and other evidence in the record.

Record at 34, *citing* 513, 515, 549, 550.

Thus, the ALJ explained at length his basis for concluding that Javier P.'s subjective symptoms were not work-preclusive, with many explicit references to the nature of his treatment, objective testing, examination results, and even Javier P.'s own statements on other occasions. Javier P. criticizes the ALJ's analysis in some respects, but not in ways that seriously undermine the ALJ's decision. For example, he points out that new x-rays of the lower back were ordered by his primary care physician in 2023, undermining the ALJ's assumption that he had not "demonstrated concerning examination findings." Request for Review at 22, *citing* Record at 1306. However, Javier P. concedes that "imaging did not occur." *Id*. Although he suggests that financial limitations might have caused this, he does not explain why he would have been able to obtain an x-ray in 2020 but not in 2023. Without other evidence to the contrary, therefore, this appears to be another example of Javier P. not "following through" with treatment suggestions.[2] Javier P. has not shown he is entitled to relief on this basis.

---

[1] Javier P. argues that "entirely consistent" is an incorrect standard, since SSR 16-30 requires only "reasonable" consistency. Request for Review at 21. It is clear, however, that the ALJ used the phrase "entirely consistent" because he found Javier P.'s subjective statements credible to an extent. Otherwise, he would not have limited Javier P. to a modified range of light work. Record at 30.

[2] Although the ALJ did not rely on this, it can also be noted that Javier P.'s testimony was not even uniformly consistent with his other testimony. At his August 2, 2022, hearing, Javier P. explicitly testified that he was unable to write, except for his name. Record at 59-60. Immediately afterward, he was confronted with his Daily Activities Questionnaire and his Functional Report, both requiring written responses, and he admitted that he completed them. Record at 60-1, 488, 513.

*V.      Conclusion*

In accordance with the above discussion, I respectfully recommend that the Plaintiff's

Request for Review be DENIED, and judgment entered in favor of the Commissioner.


BY THE COURT:


*/s/ Scott W. Reid*

_____
SCOTT W. REID
UNITED STATES MAGISTRATE JUDGE